Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 1 of 51

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
INDEX NO. 151986/2018
NYSCEF DOC. NO. 2   Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 2 of 51   NYSCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 1 of 50 PageID #: 1277
JUN 1 5 2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                               :
UNITED STATES OF AMERICA,
                                               :
                            Plaintiff,         :     REPORT OF
                                                     INVESTIGATION OF
                                               :     ALLEGATIONS OF
           - against -                               CORRUPTION AND
                                               :     RECOMMENDATION
                                                     OF REMOVAL
                                               :
LOCAL 282 OF THE INTERNATIONAL:
BROTHERHOOD OF TEAMSTERS, et al.,              :
                                                     Civil Action
                            Defendants         :     No. CV-94-2919

                                               :     (Platt, J.)
------------------------------------------------------X

Robert A. Machado
Investigations Officer

-1-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM    INDEX NO. 151986/2018
NYSCEF DOC. NO. 2  Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 3 of 51 NYSCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 2 of 50 PageID #: 1278

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                  :

UNITED STATES OF AMERICA,
                                  :

                Plaintiff,     :    **REPORT OF**

                                  :    **INVESTIGATION OF**
                                      **ALLEGATIONS OF**
                                :    **CORRUPTION AND**
      - against -                **RECOMMENDATION**
                                    :    **OF REMOVAL**

LOCAL 282 OF THE INTERNATIONAL:
BROTHERHOOD OF TEAMSTERS, <u>et al.</u>,
                                  :    **Civil Action**
                **Defendants**       **No. CV-94-2919**
                                  :    **(Platt, J.)**

-----------------------------------------------------------X

## I.   <u>INTRODUCTION</u>

The Local 282 Investigations Officer[1] respectfully submits this report of investigation to recommend that, pursuant to Section III, H.1 of the Revised Third Amended Consent Judgment, Local 282 remove Gary LaBarbera, a member of Local 282 and its former President and a former Trustee to the Local 282 Trust Funds as a member. As set forth below, LaBarbera caused the Local 282 Welfare, Pension, Annuity, Job Training, and Vacation/Sick Leave Trust Funds (the Trust Funds) and the Local 282 Union Dues and Building Funds (the Union Funds) to overlook an "alter ego"[2] company called C & H Materials, Inc. owned by Joseph

---

[1] In the original Consent Judgment, the First Amended Consent Judgment and the Second Amended Consent Judgment in this case, the Investigations Officer's title was "Corruption Officer." That title was changed in the revised Third Amended Consent Judgment to Investigations Officer, with no change in duties or responsibilities relevant to the investigation described in this report. For the purposes of this report, the term "Investigations Officer" shall be used to refer to the undersigned, regardless of his title at the time of the events being described.

[2] An "alter ego", or "double breasted" operation (the terms will be used interchangeably throughout this report) exists when a company signed to a collective bargaining agreement with

Sullo, an employer whose company, Brer - Four Transportation, has a collective bargaining agreement with Local 282.

In summary, an extensive investigation that included reviewing thousands of pages of documents and interviewing and deposing witnesses, has revealed that, among other things:

1)     In approximately 1998, Joseph Sullo, the president of Brer - Four, founded C & H Materials, Inc., a non-union trucking company. C & H employed Local 282 members to perform "covered employment."[3] However, Joseph Sullo did not make the required contributions to the Trust Funds and Union Funds on behalf of Local 282 members who performed such work for C & H.

2)     C & H Materials, Inc. constituted an illegal double breasted operation and was used to defraud the Trust Funds, and Union Funds by avoiding payment of contributions to Trust Funds and Union Funds as required by the collective bargaining agreement between Brer Four Transportation and Local 282.

3)     On May 1, 2002, the Investigations Officer informed LaBarbera that he had received information which suggested that Joseph Sullo was operating C & H as a double breasted operation. LaBarbera stated that he would look into the matter.

4)     Between May 1, 2002, and June 11, 2002, Joseph Sullo and Anthony Sullo, in telephone conversations and meetings, implicitly acknowledged to LaBarbera, Paul Gattus (the then- Vice-President of Local 282 and a Trust Fund Trustee) and Bruce Levine (a member of the law firm of Cohen, Weiss & Simon, one of the Trust Funds' attorneys) that C & H was a double breasted operation. In addition, Louis Sullo, during a telephone conversation with Paul Gattus, acknowledged that C & H was a double breasted operation and stated to Gattus that Gattus had known that for some time.

---

Local 282 operates an affiliate company that is not a signatory, in an attempt to evade monetary obligations to the Trust Funds and the Union Funds. The signatory company and the double breasted entity usually have common ownership and perform the same work utilizing the same employees and equipment, etc.

[3] "Covered employment" is work which is described in the union's collective bargaining agreement with an employer performed by Local 282 members for an employer who has a contract with Local 282, requires the employer to make contributions to the Local 282 Trust Funds and Union funds.

5)    Between May 1, 2002 and June 11, 2002, Mr. LaBarbera told the Investigations Officer on several occasions that Anthony Sullo had threatened LaBarbera that he would "go to Washington" if the Local 282 Trust Funds took any action to collect contributions for covered work performed by Local 282 members for C & H.

6)    On Thursday, June 6, 2002, LaBarbera informed the Investigations Officer that the Trust Funds would be conducting a special audit of Brer - Four and C & H to determine if double breasting was occurring.

7)    On Tuesday, June 11, 2002, LaBarbera, Gattus, and Levine informed the Investigations Officer that the special audit had been completed and that C & H was not an alter ego of Brer - Four. LaBarbera stated that any work that Local 282 members performed for C & H was not covered employment and therefore C & H was not required to make contributions to the Local 282 Trust Funds.

8)    The statements made by LaBarbera on June 11, 2002 were false. Not only was C & H in fact a double breasted entity performing covered work, but at the time LaBarbera made the statements, the special audit was still being performed, and the auditors had not yet concluded whether C & H was a double breasted operation.

9)    The auditors issued their report on September 3, 2002. That report, which was received by the Trust Funds on September 9, 2002, did state that C & H was not a double breasted operation. However, depositions of the auditor who conducted the audit, his supervisor, and the principal of the auditing firm revealed that the auditors substantially violated the Trust Funds' procedures and requirements for conducting audits. Most egregiously, the auditors did not make any effort to obtain the books and records of C & H to determine whether Local 282 members employed by Brer - Four also performed covered work for C & H despite being told specifically "please look for possible alter ego, C & H Material." The Investigations Officer is unable at this time to determine why this breach of standard procedure occurred.

10)   On January 24, 2005, as a result of an investigation by the Office of Labor Racketeering and Fraud Investigations of the United States Department of Labor which was initiated upon the referral by the Investigations Officer, Joseph Sullo pled guilty to one count of Conspiracy to Launder Money in connection with his conduct in defrauding the Local 282 Trust Funds by operating C & H as a double breasted operation. In connection with his plea, Joseph Sullo was directed by the court to pay restitution to the Trust Funds in the amount of $238,979.00.

-4-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. 2 Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 6 of 51 NYSCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 5 of 50 PageID #: 1281

## II. INVESTIGATIONS OFFICER'S AUTHORITY TO CONDUCT INVESTIGATIONS AND ISSUE REPORTS

This report is submitted pursuant to the Investigations Officer's authority under

Section III. H.1, III.R.1 and Section XI of the Revised Third Amended Consent Judgment (the

Consent Judgment) in this case.[4] Those sections state:

III. H.  To seek to remove, suspend or otherwise discipline union members in Local 282, for engaging in acts of Corruption as defined herein, as follows:

    1.    The Investigations Officer shall first refer the proposed charges and a report containing the supporting evidence which he deems can be disclosed to the Local 282 President and the General Counsel of the IBT or his designee. Such charges shall be brought before the Executive Board of Local 282 or a panel as provided for in Article XIX of the IBT Constitution. . . .

III. R.  1.    The Investigations Officer will have the day-to-day responsibility to investigate, gather evidence, and take actions to eliminate the influence of corruption from Local 282 . . . ;

XI.    The Investigations Officer shall have the powers, rights, and responsibilities described below during his term of office:

    A.    To investigate corruption within Local 282, with such assistance as he/she deems appropriate, subject to any provisions set forth in the Amended Consent Judgment. For the purpose of the Revised Third Amended Consent Judgment, the term "Corruption" shall include, but not be limited to, bribery, embezzlement, extortion, kickbacks, graft, loan sharking, hijacking, larceny and theft, violations of 29 U.S.C. § 186, racketeering activity as defined in 18 U.S.C. § 1961(1), the domination, control, influence by, or association with any organized crime element, and any of the activities violative of Provisions I. A.- C. herein;

    B.    To interview any Local 282 officer, administrator, organizer, business agent, employee, steward, negotiator, trustee or member, or the IBT Trustee, about any matter within the jurisdiction of his/her powers and duties, and to gain entrance to, inspect and investigate, without advance

---

[4] The language quoted in this section is from the Revised Third Amended Consent Judgment, dated, April 4, 2007. The prior consent judgments in this case contained similar or identical language.

notice or permission, any job site, depot, building or office at which members of Local 282 are working;

C.   To the same extent that the IBT Trustee or Local 282 is entitled under applicable laws or agreements, to obtain access to any records, or to investigate or interview any persons under the control of an employer who employs employees represented by Local 282, including but not limited to access to such records or persons relating to contributions made by employers to pension or other benefit plans in which Local 282 members participate, relating to any matter within the jurisdiction of his/her powers and duties . . . ;

Section III of the Consent Judgment further provides that the Investigations

Officer has the following powers and duties:

I.   To receive the assistance of federal, state, and local law enforcement authorities in effecting the powers, rights, and responsibilities enumerated herein and accomplishing the mandate of ending corruption and abuse within Local 282;

J.   To refer possible violations of law to federal, state, or local law enforcement authorities;

K.   To have full, complete and unfettered access to all books, records, files, accounts, and correspondence of Local 282, its Executive Board, officers, IBT Trustee, and any benefit plans in which members of Local 282 participate (to the same extent that Local 282 or the IBT Trustee has such access), including but not limited to access to all records which would be available to the Chief Investigator's Office of the IRB under the IBT Consent Decree, about any matter within the jurisdiction of the Investigations Officer's powers and duties.

## III.   <u>LOCAL 282 AGREEMENT AND DECLARATION OF TRUST</u>

As part of the standard Local 282 collective bargaining agreement, employers are required to make contributions to the Trust Funds on behalf of all employees who perform covered work. These funds provide benefits including health coverage, pension and annuity payments. The Local 282 Welfare, Pension, Annuity, Job Training, and Vacation and Sick Leave Trust Funds have established guidelines governing appointment of trustees, contributions, collections, payroll auditing, and litigations. Pertinent sections include:

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM      INDEX NO. 151986/2018
NYSCEF DOC. NO. 2 Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 8 of 51NYSCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 7 of 50 PageID #: 1283

Article I- Definitions

Section 7.      Employer Contributions. The Term "Employer Contributions" as used herein shall
                mean payments by Employers to any of the Trust Funds created by Articles II
                (Welfare Trust Fund), III (Pension Trust Fund), IV (Annuity Trust Fund), V (Job
                Training Trust Fund), and VI (Vacation and Sick Leave Fund) hereof in accordance
                with the collective bargaining agreements.

* * * *

Article VII- Trustees

Section 1.      The Trustees under this agreement and Declaration of Trust, who shall be Trustees
                of the Trust created and established by Articles II, III, IV, V, and VI hereof, shall
                be eight in number, four of whom shall be Union Trustees, and four of whom shall
                be Employer Trustees. Generally speaking Local 282 Union representatives,
                including the President, Secretary Treasurer, Vice-President, and Recording
                Secretary are appointed to the Board of Trustees.

Section 7.      The Trustees shall discharge their duties hereunder solely in the interest of the
                participants, former participants and beneficiaries of the Funds and for the
                exclusive purpose of providing benefits to participants and beneficiaries in
                accordance with the terms of the Plans and for defraying the reasonable expenses
                of administering the Funds, and shall act with care, skill, prudence and diligence
                under the circumstances then prevailing that a prudent person acting in a like
                capacity and familiar with such matters would use in the conduct of an enterprise
                of a like character and with like aims.

Section 9.      (a) Questions concerning any action to be taken by the Trustees pursuant to this
                Agreement and Declaration of Trust shall be decided by majority vote...

* * * *

Article IX- Collection of Contributions

Section 1.      (a)     Each and every Employer shall pay to the Trustees the Employers'
                        Contributions to the Welfare Trust Fund, the Pension Trust Fund, the
                        Annuity Trust Fund, the Job Training Trust Fund and the Vacation and Sick
                        Leave Trust Fund as set forth in Article II, III, IV, V and VI of this
                        Agreement, as required by the collective bargaining agreement to which the

-7-

Employer is a party.[5]

* * * *

Section 1.    (c)    Detailed written reports shall be submitted to the Trustees by the Employers together with each monthly payment (regardless of whether contributions are owing for that month), the said reports to be in such form as may be requested from time to time by the Trustees.

Section 1.    (d)    The Trustees may at any time audit the pertinent books and records of any Employer in connection with the above.  Pertinent books and records of an Employer include the books and records of any business which is bound by a collective bargaining agreement with the Union which requires contributions to any of the Funds and any other business entity which is affiliated with such business and which either: 1) has employed persons who have performed the same type of work as the employees of the Employer covered by the Union agreement, or 2) is part of a group of trades or business "under common control," as the term is used in 29 U.S.C. § 1301 (b) (1) for withdrawal liability purposes, which includes the Employer.

Pertinent books and records shall include, but not necessarily be limited to, the types of records and documents listed herein for all individuals who perform work for each business described above (whether or not the individual is covered by a collective bargaining agreement with the Union or is an Employee as defined in this Agreement and Declaration of Trust or as a matter of law: (1) payroll records, including payroll journals, time cards, print-outs, ledgers or any other form of payroll record; (2) Payroll tax records submitted to federal and state governments, including Forms 941 and W-2; (3) Complete business income tax returns; (4) Cash disbursement records; (5) General ledgers; (6) Records relating to the hiring of trucks including equipment vouchers, invoices and payment records; and (7) any other records specifically requested by the Funds' auditors, including the classifications of Employees, their Social Security numbers and the amount of wages paid and hours worked.  The Trustees may, from time to time, designate additional categories of documents as pertinent books and records without further notice to the Employers.

Section 1.    (e)    In the event the Employer fails to submit the required reports and/or

---

[5]It should be noted that the "employer's contributions" to the Trust Funds are actually a portion of the members wages that are allocated from their negotiated collective bargaining agreement wage package.

-8-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 10 of 51 NYSCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 9 of 50 PageID #: 1285

pertinent books and records for audit within twenty (20) days after written demand, the Trustees, or their agents, may compute the sum due for any month by adding 10 percent to the number of hours for the month in which the largest number of hours were reported in the previous twelve (12) reports submitted by the Employer....

Section 1.    (f)    The amount of contributions so computed shall be binding on the Employer for the purposes of any legal proceeding. Alternatively or in addition to the foregoing and any other remedies provided by law, the Trustees may, in their discretion, apply for and be entitled to a mandatory injunction directing the employer to produce its said books and records for audit.....

Section 19(j) of the Local 282, IBT - Nassau - Suffolk Heavy Construction &

Excavating and Asphalt Agreement, to which Brer - Four has been a signatory since 1986,

incorporates by reference the terms of the Trust Agreements governing the Local 282 Trust Funds.

## IV.    THE INVESTIGATION

### A.    Initial Investigation

On Tuesday, March 26, 2002, the Investigations Officer received a telephone call

from Donna Plastino, the ex-wife of Local 282 member Eugene Plastino. Ms. Plastino

complained that the owner of Brer - Four, Joseph Sullo, was violating a court order requiring Mr.

Sullo to withhold a portion of Mr. Plastino's weekly paycheck and remit those funds to Ms.

Plastino for child support. In addition, she reported that Brer - Four was running a double

breasted operation called C & H Materials which was paying Local 282 members, including Mr.

Plastino, for performing covered work.

On Wednesday, May 1, 2002, Ms. Plastino called the Investigations Officer and

once again told him that C & H was a double breasted company of Brer - Four, owned and

operated by Joseph Sullo. Following the telephone call, Ms. Plastino faxed to the Investigations

Officer copies of Eugene Plastino's W-2 Federal Wage and Tax Statement forms issued by C &

-9-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 11 of 51 SCEF: 03/05/2018

Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 10 of 50 PageID #: 1286

H. The W-2 forms were for the tax years 1998, 1999, and 2000.

On Wednesday, May 1, 2002, the Investigations Officer informed Gary LaBarbera, then President of Local 282 and a Trustee of the Trust Funds, that he had received an allegation that Brer - Four and its owner, Joseph Sullo, were engaging in double breasting through C & H. The Investigations Officer also informed LaBarbera that he was in possession of three W-2 forms from C & H in the name of a Local 282 member, whom the Investigations Officer did not identify. The Investigations Officer informed LaBarbera that one particular W-2 form indicated that the member had earned nearly sixteen thousand dollars from C & H in one particular year. The Investigations Officer requested that LaBarbera investigate the allegations. LaBarbera responded by calling Paul Gattus, then Local 282 Vice-President and a Trustee of the Trust Funds, into the room. LaBarbera told Gattus to conduct an investigation.

On Tuesday, May 14, 2002, the Investigations Officer was informed by a confidential source that a few years earlier, LaBarbera, Gattus, Eugene Bouden, (then a Local 282 Business Agent) and Paul Kuloszewski (then a Local 282 steward) attended a dinner with Joseph Sullo, his brother Louis, and father Anthony Sullo. According to the confidential source, Local 282 officials, including LaBarbera and Gattus, indicated at the dinner that they were aware of and approved the Sullos' double breasted operation.

Between May 1, 2002 and June 11, 2002, LaBarbera told the Investigations Officer on several occasions that Anthony Sullo had threatened LaBarbera that he would "go to Washington" if LaBarbera did not take care of the Local 282 investigation of C & H. LaBarbera stated that he did not know what Anthony Sullo meant by "going to Washington." LaBarbera also stated that Anthony Sullo acknowledged that Joseph Sullo was in fact operating a company

-10-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM        INDEX NO. 151986/2018
NYSCEF DOC. NO.  Case 1:18-cv-02376-GHW  Document 3-3  Filed 03/16/18  Page 12 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW  Document 511  Filed 06/15/09  Page 11 of 50 PageID #: 1287

by the name of C & H.

On Thursday, June 6, 2002, LaBarbera met with the Investigations Officer in the Investigations Officer's office. LaBarbera told the Investigations Officer that Anthony Sullo had called him again, and said that his son Joseph may have made some mistakes, but that Joseph wanted to settle any potential claim regarding C & H's double breasting. LaBarbera said that Anthony Sullo again threatened him, stating "I don't want to go somewhere else with this." LaBarbera told the Investigations Officer that he told Anthony that an audit of Brer - Four and C & H would nevertheless have to be conducted.

On Tuesday, June 11, 2002, the Investigations Officer had another meeting in his office with Gary LaBarbera, Paul Gattus, and Bruce Levine. LaBarbera stated that the auditors had completed their audit and did not find any connection between Brer - Four and C & H. The audit, he said, was "clean," i.e, that C & H was not a double breasted operation. LaBarbera added that the Sullos claimed that they employed Local 282 members at C & H to do maintenance work, mechanic's work, and additional work not covered by the collective bargaining agreement. LaBarbera further stated that any driving performed by Local 282 members being paid by C & H did not involve trucks belonging to Brer - Four. LaBarbera additionally said that the Local 282 member who had been reported by his ex-wife as working for C & H would not be allowed to do so any longer. Finally, LaBarbera stated that the Sullos claimed they employed Local 282 members to perform non-bargaining unit work because they wanted to keep the members employed during the slow winter months to avoid losing their good drivers to other companies.

Also on Tuesday, June 11, 2002, the Investigations Officer's confidential source told him that Gary LaBarbera had met with Anthony Sullo over the weekend of June 8 and 9,

-11-

2002, and that Anthony Sullo once again threatened LaBarbera to go "where he has to" if LaBarbera did not "take care of" the audit and investigation into Brer - Four and C & H. The source also reiterated his claim that Anthony, Joseph and Louis Sullo and LaBarbera had attended a dinner a few years earlier where LaBarbera allegedly learned and approved of the Sullos' double breasted operation.

On Thursday, July 18, 2002, the Local 282 Executive Board held a meeting with members employed by Brer - Four. The Investigations Officer attended the meeting. The purpose of the meeting was to obtain information from the members regarding whether they were performing covered work for C & H Materials. The members were instructed in a letter from the Local 282 executive board to bring copies of their pay stubs and W-2 forms from both Brer - Four and C & H to the meeting. Those members that did attend the meeting produced only pay stubs from Brer - Four and did not produce W-2 forms for either Brer - Four or C & H. The meeting was chaired by LaBarbera, who told the members "that he understands from Joseph Sullo that they did not do bargaining unit work for C & H that they worked around the yard and on the trucks."

After this meeting, it was apparent to the Investigations Officer that Local 282 was not going to pursue a further audit or investigation of C & H. Because the evidence strongly suggested that C & H was a double breasted operation, the Investigations Officer conducted his own further investigation to determine conclusively whether C & H was a double breasted operation and what, if any, actions union officials had taken to condone, encourage, perpetuate, or assist the Sullos in operating C& H as a double breasted entity.

-12-

B.    Continued Investigation

The Investigations Officer initially reviewed public records and Local 282 business records pertaining to Brer - Four and Joseph Sullo in an effort to determine if Joseph Sullo had any connection with C & H. C & H was incorporated on January 14, 1994. Its principal officer listed with the New York Secretary of State is Claudine Colasanti, Joseph Sullo's wife. The address on file with the Secretary of State for C & H is the Sullo residence in Plainview, NY.

On Friday, September 6, 2002, pursuant to his authority under the Consent Judgment, the Investigations Officer served a subpoena *duces tecum* and non disclosure order on Citibank for the checking accounts of Brer - Four and C & H. The subpoenas requested copies of bank statements, including images of checks; copies of deposited items with deposit slips; identities of authorized signatories for the two companies and identification of any other accounts in the names of Brer - Four, C & H, Joseph Sullo and Claudine Colasanti - Sullo. The subpoenas covered the period of time from January 1, 1998 through July 31, 2002, which included the tax years of the W-2 Wage and Tax Statement forms sent by Donna Plastino.

Beginning in January, 2003, the Investigations Officer conducted an exhaustive analysis of the documents subpoenaed from Citibank. The documents included copies of over 6,000 checks for both the Brer - Four and C & H checking accounts. In addition, over four hundred deposits made into both checking accounts were reviewed. The analysis uncovered evidence that on a weekly basis, both accounts were being utilized to pay the same Local 282 members, and that members of Local 282 were paid on the same day or consecutive days from both the Brer - Four account and the C & H account. Joseph Sullo and Claudine Colasanti - Sullo exercised signature authority over the C & H checking account, while Joseph Sullo, his brother

-13-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 15 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 14 of 50 PageID #: 1290

Louis Sullo, and his sister-in-law Suzanne Sullo, exercised signature authority over the Brer-Four checking account. In addition, Joseph Sullo's handwriting appeared on checks drawn on both accounts.

Moreover, the deposits made into the Brer - Four and C & H checking accounts revealed that the companies shared the same customers for the majority of their work. For example, Brer - Four deposited nearly $4,200,000.00 in receipts from Con-Agg Recycling Corp. between January 1, 1998 and July 31, 2002. During the same period of time, C & H deposited nearly $1,250,000.00 in checks from Con-Agg.

Analysis of the payroll checks for C & H indicated that from January 1, 1998 through April 30, 2002, Local 282 members were paid for approximately 15,400 hours of work performed for C & H, without appropriate contributions made to the Trust Funds. Accordingly, the Investigations Officer determined that Brer - Four and C & H had defrauded the Trust Funds in the approximate amount of $258,000.00 excluding potential interest, penalties, and liquidated damages.[6]

Based upon this information, the Investigations Officer referred the matter to the United States Department of Labor, Office of Labor Racketeering and Fraud Investigations and the United States Attorney's Office for the Eastern District of New York. On April 20, 2007, Joseph Sullo was sentenced to two years' probation after having he pled guilty to one Count of Conspiracy to Launder Money in connection with his use of a double breasted company, C & H, to embezzle contributions due to the Trust Funds.

---

[6] The $258,000.00 figure was based on the Investigation Officer's analysis of payroll checks of C & H Materials Inc. made payable to members of Local 282. When the court issued its order of restitution, it modified that amount to $238,979.00.

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 16 of 51SCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 15 of 50 PageID #: 1291

INDEX NO. 151986/2018

C.    Investigation into Possible Involvement Of Union Officials and Consultants

1.    Statements of Joseph and Anthony Sullo

Because evidence existed to suggest that LaBarbera and possibly others associated with the union, including Gattus and Levine, may have engaged in or facilitated acts of corruption in connection with Sullo's double breasting, the Investigations Officer continued his investigation after Sullo was sentenced.

As part of that investigation, on Monday, July 30, 2007, Joseph Sullo was deposed. Sullo was and is currently employed as the President of Brer - Four, which his father founded in 1986. Brer - Four has had a collective bargaining agreement with Local 282 since 1986 and is in the business of transporting construction materials (sand, gravel, asphalt, and concrete) in dump trucks and dump trailers. The dump trucks and dump trailers are owned by Brer - Four.

Brer - Four's mailing address is in Hicksville, NY, but its operations are actually located in Farmingdale, NY. Brer - Four has four permanent employees: Joseph Sullo, Louis Sullo, Claudine Colasanti - Sullo and Suzanne Sullo. Joseph Sullo, as President, is responsible for obtaining work for Brer - Four, organizing the trucks, driving if necessary, and negotiating contracts. Louis Sullo, Joseph's brother, is the Vice President of Brer - Four and performs maintenance work, including mechanic's work on Brer - Four trucks. Claudine Colasanti - Sullo, Joseph's wife, does all of the billing work. Suzanne Sullo's duties include processing all of the payables. Brer - Four also employs several part time employees, including Joseph's brother Michael Sullo, Joseph's nephew Jack Sullo, and an individual named Javier Rivera, to do yard work, and perform maintenance on the trucks. Brer - Four has used the services of Andrew Kaplan of Kaplan Management to do its accounting work since Brer - Four's inception in 1986.

-15-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 17 of 51 SCEF: 03/05/2018
INDEX NO. 151986/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 16 of 50 PageID #: 1292

Joseph Sullo said he founded C & H in 1998 in order to pay Local 282 members less than the wages and benefits required by the collective bargaining agreement. He acknowledged that Local 282 members employed by C & H drove the same trucks and performed the same type of work as they did for Brer - Four. For the hours they worked for C & H, the members were paid an hourly rate of pay, but C & H did not make any contributions to the Trust Funds on behalf of the Local 282 members.

Joseph Sullo also testified that he believed that Local 282 approved of his double breasting. He based his belief upon a conversation that he had at a dinner in 1999 at Venere's Restaurant in honor of his father, Anthony Sullo, when Anthony retired from King Kullen. Gary LaBarbera, Paul Gattus, Eugene Bouden, and Paul Kuloszewski attended the dinner. Joseph Sullo said that after the dinner, Gattus told him that "we know that all companies are cheating and that we cannot do anything unless a driver of those cheating companies comes forward." Sullo interpreted Gattus' statements to mean that Gattus knew Sullo was operating a double breasting entity and did not object.

In his interview with the Investigations Officer, Anthony Sullo described the dinner at Venere's Restaurant similarly. Anthony recalled that during the course of the dinner, Joseph Sullo's corporations were mentioned in connection with the topic of double breasting. Anthony Sullo told the Investigations Officer that Paul Gattus explained to Joseph and Anthony how to set up a double breasted company. Gattus said that one should set up three separate corporations; a union company, a non-union company, and a leasing company to own the company's trucks. Gattus also explained that the corporations should not have the same listed owners. According to Anthony Sullo, LaBarbera was aware of the conversation that Gattus was

-16-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 18 of 51 NYSCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 17 of 50 PageID #: 1293

involved in, and that LaBarbera never spoke up to explain that what Gattus was describing was illegal.

Joseph Sullo testified that in May 2002, he received a telephone call from Gattus. Gattus told him that Local 282 was going to be conducting an investigation into the relationship between Brer - Four and C & H. Gattus said that the reason for the investigation was that the union had received a complaint from a driver. Sullo thought that Local 282 was "blackmailing him" because of the active role Sullo recently had taken in contract negotiations.

Joseph Sullo testified that a few days after the call from Gattus, he overheard his brother Louis Sullo yelling at Gattus over the telephone. Louis was angry about the pending audit of Brer - Four and C & H. Joseph said that Louis told Gattus during the conversation that Gattus knew the Sullos were operating a double breasted entity and had agreed to overlook it.

On or about May 10, 2002, Joseph Sullo received a telephone call from Gary LaBarbera. LaBarbera complained to Joseph Sullo about the accusations Louis had made against Gattus. LaBarbera also explained to Joseph Sullo in that conversation that the Trust Funds were required to perform the audit because an unknown individual had gone to the Investigations Officer with evidence of the Sullo alter ego company. In response, Joseph Sullo asked LaBarbera if he could resolve the problem by simply paying the wages and making contributions to the Trust Funds on behalf of the one individual member who had been identified as working for C & H. LaBarbera did not respond to Sullo's question, but put Bruce Levine on the speaker phone in LaBarbera's office. Levine explained to Joseph Sullo that under the ERISA statute, the Trust Funds would have to perform an audit and would go back as far as six years. Levine stated that the Trust Funds would also have to collect the books and records from both companies in order to

-17-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 19 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 18 of 50 PageID #: 1294

conduct an audit.

A review of Cohen, Weiss and Simon's billing records confirms that Levine did participate in a conversation with LaBarbera and Joseph Sullo on May 10, 2002. Levine billed Local 282 for fifteen minutes of his time for "telephone conference with G. LaBarbera and Brer - 4 principal re: alter ego allegations." In addition, a review of the telephone message log for Gary LaBarbera indicates that Joseph Sullo called LaBarbera at Local 282 at 2:10 P.M. on May 10, 2002 and left a message for LaBarbera to call him back at Brer - Four.

On or about May 14, 2002, Joseph and Anthony Sullo met with LaBarbera in LaBarbera's office. LaBarbera acknowledged to them that he was aware of C & H, and told them that the union would have to conduct an investigation of both companies' books and records. Joseph Sullo agreed to make both companies' records available to the auditors.

Joseph Sullo also informed LaBarbera at that meeting that Local 282 auditors had recently completed a regular audit of Brer - Four. LaBarbera then called William Maye, the Fund Administrator, who confirmed that a recent audit had been completed. LaBarbera stated to Sullo that the previous audit would be included and used as part of the investigation. Joseph Sullo was confused at LaBarbera's statement because the previous audit only pertained to Brer - Four, and there had been no review of C & H's books and records.

Later in May and in early June, 2002, LaBarbera informed the Investigations Officer on several occasions that Anthony Sullo had called LaBarbera and threatened him that he would "go to Washington" if LaBarbera didn't "take care of" the audit of Brer - Four and C & H. For example, on Thursday, June 6, 2002, Gary LaBarbera informed the Investigations Officer that Anthony Sullo had called him and threatened him on the telephone. LaBarbera stated that

-18-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 20 of 51 NYSCEF: 03/05/2018

INDEX NO. 151986/2018

Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 19 of 50 PageID #: 1295

Anthony Sullo told him that his son, Joseph Sullo "may have made some mistakes," but wanted to settle the issues regarding C & H Materials Inc., and the double breasted operation. According to LaBarbera, Anthony Sullo stated "I don't want to go somewhere else with this." Although LaBarbera took Sullo's statement as an overt threat of some nature, he claimed not to know what Anthony Sullo was referring to.

Both Anthony and Joseph Sullo confirmed that Anthony had made such statements. Anthony stated that he wanted to contact an F.B.I. agent he knew in Washington D. C. to report that as Joseph Sullo had described it to him, the audit of C & H was an improper effort by LaBarbera and Local 282 to blackmail Joseph Sullo and get him to negotiate the new collective bargaining agreement less aggressively.

In November 2002, Joseph Sullo received a notice from the Trust Funds informing him that the Trust Funds Special audit of Brer - Four and C & H had concluded there was no double breasted operation. Joseph Sullo said he was surprised by this, particularly because no one had ever asked to see C & H's books and records.

2.    The Auditors

In order to determine why the auditors failed to discover that C & H was an alter ego company, three representatives from the auditing firm of Abrams, Herde and Merkel, LLP were deposed: Barrie Abrams, a senior partner at the firm; Ken Jones, who, in 2002, was the Abrams firm supervisor responsible for supervising the Brer - Four/C & H special audit[7]; and Adam Novick, the auditor who actually conducted the Brer - Four/C & H special audit.

---

[7] Jones worked for the Abrams firm until 2004, when he left to supervise audits for the firm of Wagner Zwerman, which also performs audits for the Trust Funds.

-19-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 21 of 51 SCEF: 03/05/2018

Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 20 of 50 PageID #: 1296

a.    The Audit Process

The Trust Funds retain auditors to audit the books and records of signatory employers in order to ensure that employers are making proper payment to the funds. Regular audits are conducted annually of every employer. In addition, under certain circumstances, including when double breasting is suspected, the Funds direct the auditors to conduct special audits. Until recently,[8] Abrams, Herde and Merkel LLP was one of the firms retained by the Trust Funds to conduct payroll audits. In 2002, Ken Jones was responsible for supervising Local 282 Trust Fund payroll audits. An integral part of his duties was to ensure that the auditors reviewed appropriate book and records, including cash disbursements,[9] payroll ledgers, business records, and corporate tax returns. Adam Novick was the auditor assigned to the Brer-Four/C&H special audit in 2002. Barrie Abrams, as the lead partner at Abrams, Herde and Merkel, was ultimately responsible for ensuring that audits were conducted according to the guidelines outlined in the Declaration of Trust.

Generally, the audit process is initiated by a request from the Trust Funds. The assigned auditor then contacts the employer to schedule a time to review the employer's books and records. Prior to reviewing the books and records, the auditor reviews the employer's remittances to the Trust Funds. While at the auditing location, most commonly at the offices of the employer's accountant, the auditor reviews the employer's payroll records, cash

---

[8] As a result of the Investigations Officer's investigation of C & H, the Trust Funds terminated Abrams, Herde & Merkel as its payroll auditors in 2008. Abrams, Herde and Merkel continues to be retained as the Funds' Accountants.

[9] "Cash disbursement ledgers" include records, cash payments, business checking accounts and general corporate ledgers.

-20-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 22 of 51 SCEF: 03/05/2018

INDEX NO. 151986/2018

Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 21 of 50 PageID #: 1297

disbursements, general ledger, and the corporate tax returns, in an attempt to determine if there are any affiliated companies, inter-company transactions, and identify ownership of the companies. The auditor then makes a determination of the number of hours worked by each employee. From this analysis, the auditor determines whether the employer is making proper contributions to the Trust Funds. Upon completion of the audit, the auditor prepares a written report. After it is reviewed by the audit supervisor, the written audit report is forwarded to the Trust Fund office. It is the Trust Funds' policy that such "regular" audits are conducted annually.

Ferreting out possible double breasted operations is an integral part of the auditing firm's responsibility in auditing employers' books and records. Auditors are trained to look for signs of union and non-union payrolls, and seek out suspicious transfers of monies between companies. Where suspicion exists that double breasting is occurring, the auditor's standard practice is to request the books and records from both companies, which employers generally provide. In the event the employer refuses to allow the auditors access to the books and records of the suspected double breasted company, the auditor is required, as per the Trust Agreement, to send what is commonly called an "unable letter" to the Trust Funds, notifying the Trust Fund office that it has not been possible to conduct the audit of the suspected double breasted company. In the "unable letter," the auditor identifies the reasons why he believes that there may be an alter ego company, and why the employer is refusing to allow him access to the pertinent books and records to conduct the audit. The issuance of an "unable letter" invariably generates involvement of the Trust Funds Counsel to obtain the records. In the past, auditor referrals have resulted in hundreds of successful litigations by Trust Fund counsel to obtain access to both companies' books and records. According to Jones, in auditing to determine if double breasting is occurring,

-21-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM   INDEX NO. 151986/2018
NYSCEF DOC. NO.   Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 23 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 22 of 50 PageID #: 1298

"we're legally allowed to go back six years, so we go back six years."

The Board of Trustees is generally not informed about payroll audits unless there is an issue that requires commencement of litigation in connection with an audit; i.e., if double breasting is discovered, if an employer refuses to submit to an audit, or if he refuses to produce the pertinent books and records to an auditor.

      b.    The Brer-Four/C & H "Special" Audit

In May 2002, the Trust Fund office requested that the Abrams firm conduct a special audit of Brer-Four. Adam Novick was the auditor assigned to conduct the audit. He stated that he received the audit request on May 14, 2002. The request directed Novick to conduct an audit from the period of April 27, 2001 through February 28, 2002, and to "look for a possible alter ego, C & H Materials."

Novick stated that although his normal practice was to write to the company being audited and request production of the records for the company or companies being audited, in this case, he had no record of such a letter. Donalyn Delmedico, the person at Kaplan Management responsible for providing requested records to the auditors, testified that she had no record of any such letter. Novick also apparently did not make any attempt to contact Maye or Gattus to learn the reason for the request for a special audit or why the Trust Funds suspected C & H was a double breasted operation.

Novick did make an appointment to review records at the accounting firm of Kaplan Management, and, according to his audit report, went to the Kaplan Management offices and reviewed records on three dates: June 4, 2002, June 10, 2002 and June 17, 2002. However, he reviewed only the records for Brer-Four; he did not review the records for C & H. This was

-22-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 24 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 23 of 50 PageID #: 1299

contrary to standard procedure.

Novick acknowledged at his deposition that he had not reviewed C & H's records, but claimed that he must have asked for them and was told they were not available. Similarly, Barrie Abrams, one of the principals of the Abrams firm, stated that he believed that Novick asked for and was denied the C & H records, and that this was reflected in the audit report. In fact, there is no such notation in the report, nor does there appear to have been any such request.[10] Donnalyn Delmedico stated during her deposition that she had no record of being asked for the records of C & H, and that if Novick had asked for them, she would have produced them to him, as per her office's standard procedures. Teresa Cody, who has been employed by the Trust Funds for more than thirty years, told the Investigations Officer that if the auditors had not been able to obtain the required records to perform the audit properly, the audit should not have been processed at all. Ms. Cody further testified that under such circumstances invariably the matter would be referred to Trust Fund Counsel for appropriate action.

Nonetheless, the Abrams firm issued its audit report on September 3, 2002, and it was received by the Trust Fund office on September 9, 2002. The report concluded "no alter ego found," i.e., that C & H was not a double breasted entity.[11] Because the auditors' conclusion was that there was no double breasted entity, the Trust Fund employees did not notify the Board of

---

[10] When confronted with this and other evidence that Novick did not obtain or even request the C & H records, Abrams tried to revise his testimony, claiming that the auditors were not entitled to those books and records because C & H was not a signatory to a collective bargaining agreement with Local 282. This statement is completely contradictory to the required procedures set forth in the Declaration of Trust set forth above.

[11] The auditors did find a slight discrepancy in the payments made by Brer-Four to the Trust Funds in the amount of $11,162.65, unrelated to any possible double breasting. Brer-Four paid that amount shortly after it received the report in November 2002.

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM    INDEX NO. 151986/2018
NYSCEF DOC. NO.   Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 25 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 24 of 50 PageID #: 1300

Trustees, and William Maye, the fund administrator, was not made aware of the results of the audit until May 2007.

### 3.  Union Officials and the Attorney for the Trust Funds

### a.  Paul Gattus

Paul Gattus, until his retirement in April 2006, was the Vice President and a Business Agent for Local 282. In addition, Gattus was a union trustee to the Trust Funds. Gattus acknowledged that there were several discussions over the years regarding double breasting by Joseph Sullo. Involved in those conversations were, at various times, Gattus, Anthony Sullo and Gary LaBarbera, among others. Specifically, Gattus recalled a meeting a number of years ago, which he believed might have been over lunch, between Gattus, Anthony Sullo, Joseph Sullo and LaBarbera. Gattus did not recall the entire conversation, but he did remember that Sullo said at that meeting that Sullo wanted to pay his employees less than union wages and benefits for covered employment on non-union projects. Gattus did not recall whether Sullo specifically mentioned C & H. He was, however, confident that LaBarbera was present.

Gattus recalls conducting an investigation of allegations of double breasting by Brer - Four and C & H. He does not recall learning at any time that the Investigations Officer had W-2 tax forms for a member employed by C & H, but he stated that he spoke to the Local 282 members employed by Brer - Four and they said that they did work for C & H when there was no work for them under Brer - Four. He said that they told him that they were not performing covered employment when they worked for C & H. Gattus said he reported this information to LaBarbera and Bruce Levine. He said that he expected that Levine would, as per normal procedure, also conduct an investigation.

-24-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 26 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 25 of 50 PageID #: 1301

Gattus recalled that one of the Sullos, possibly Joseph, or his brother Louis, called

him and became irate because the Union was investigating Brer - Four and allegations that the

Sullos were engaging in double breasting. He does not recall the substance of the conversation,

but recalls that the caller was extremely upset over the allegations about C & H. Gattus believes

that he reported the telephone conversation to Gary LaBarbera.

Gattus did recall that Joseph Sullo came to Local 282's offices and met with Gary

LaBarbera in his office on two occasions in the spring of 2002. Gattus stated that he did not

attend the meetings because they were behind closed doors and he was not invited by LaBarbera

into the meetings. LaBarbera did not discuss with Gattus what took place during the meetings

with the Sullos.

        b.    Bruce Levine, Esq.

Bruce Levine is a partner in the law firm Cohen, Weiss and Simon LLP, which

represents the union on labor relations and consent decree issues. Cohen Weiss and Simon is also

co-counsel to the Local 282 Trust Funds; Levine has performed worked for the Trust Funds since

1989, first as a partner in the law firms of Friedman & Levy-Warren and Friedman & Levine and

subsequently as a partner at Cohen Weiss and Simon. Levine testified that he has had substantial

experience with employers who engaged in double breasting to avoid their obligations to the Trust

Funds. During the course of his career, Levine has participated in Federal Court litigation,

arbitrations, and National Labor Relations Board proceedings where allegations of employer

double breasting had been made.

Levine claimed that the first time he recalled becoming aware that Joseph Sullo

was connected to Brer - Four was sometime in 2005. He said that he attended a meeting with

-25-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 27 of 51 RECEIVED NYSCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 26 of 50 PageID #: 1302

Joseph Sullo and Gary LaBarbera about the allegation that C & H was acting as a double breasted company for Brer - Four. During the meeting, Sullo showed Levine and LaBarbera a grand jury subpoena Sullo had received from the United States Attorney's Office for documents pertaining to C & H. Levine stated that Sullo thought that the subpoena was from Local 282 and the Trust Funds.

Levine said that he learned that C & H was an alter ego of Brer - Four only in May 2007, during a conversation with Joseph Sullo and LaBarbera. In that conversation, Joseph Sullo told LaBarbera and Levine that he had pled guilty to a criminal act and had been ordered to make restitution to the Trust Funds because he had been operating a double breasted company. Joseph Sullo presented Gary LaBarbera with checks totaling in excess of $238,000.00 payable to the Trust Funds on behalf of Brer - Four.

However, Cohen, Weiss and Simon's billing records for May 3, 2002 pertaining to Local 282 reflect that Levine had a fifteen minute meeting with Paul Gattus relating to "Brer 4, alter ego issues." At his deposition, Levine claimed he did not recall the substance of that conversation. Levine also claimed that he did not have any recollection of a fifteen minute "telephone conference with G. LaBarbera and Brer - 4 principal re: alter ego allegations," on May 10, 2002, which is also an entry in the Cohen Weiss and Simon billing records. Levine generally denied any recollection of statements by Joseph Sullo acknowledging that Sullo was operating a double breasted operation. He did not recall being informed by Joseph Sullo that Sullo was operating a double breasted company, or that Sullo said that he wanted to "make it up" by paying the correct wages and benefits to the member whose ex-wife made the original allegation of double breasting to the Investigations Officer. He also did not recall informing Joseph Sullo that

-26-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 28 of 51 SCEF: 03/05/2018

INDEX NO. 151986/2018

Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 27 of 50 PageID #: 1303

under the ERISA laws, the Trust Funds have an obligation to recoup the losses for all of the members, and to go back six years in that litigation. Levine stated that he does not have any notes relating to his conversation with Joseph Sullo on May 10, 2002.

Levine also did not recall participating in a meeting on June 11, 2002 with LaBarbera, Gattus and the Investigations Officer. However, his time records reflect such a meeting. Moreover, his firm billed this time to the Trust Funds. After being shown the billing record for May 10, 2002, Levine explained that the June 11, 2002 time was billed to the Trust Funds because the meeting related to an alter ego allegation. However, Levine said that he did not recall the purpose of the meeting, or any conversation that took place. Levine, a consummate note taker, also stated that he does not have any notes pertaining to his conversation with the Investigations Officer.

        c.    <u>Gary LaBarbera</u>

Gary LaBarbera was President of Local 282, International Brotherhood of Teamsters, from January 1, 2001 until his resignation from office effective December 31, 2008. By virtue of that position, he also served as a Trustee and Co-Chairman of the Local 282 Trust Funds.

LaBarbera became a member of Local 282 in 1981 while employed as a warehouseman at the King Kullen Warehouse, in Westbury New York. During his tenure at King Kullen, LaBarbera was appointed the Local 282 Shop Steward. In March 1995, he was appointed a Local 282 Business Agent responsible for the areas of The Bronx and Nassau County. On March 25, 1996, LaBarbera was appointed Trustee of Local 282 pursuant to the original Consent Decree in this case. In October 2000, under the First Amended Consent Decree, LaBarbera was

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 29 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 28 of 50 PageID #: 1304

elected President of Local 282. During the course of his career, LaBarbera has received training in issues regarding Trust Fund operations by attending conferences sponsored by the International Foundation of Employee Benefit Plans. The International Foundation of Employee Benefit Plans curriculum covers topics such as "collection issues, investment strategies, fiduciary duties, and fiduciary liability."

When representing Local 282 members, it was LaBarbera's responsibility to enforce the union's collective bargaining agreements, by among other things, ensuring that members were paid proper wages and benefits, by adjusting grievances and resolving contract disputes. LaBarbera was also a Trustee of the Union Funds.[12]

As a Trustee of the Trust Funds, it was LaBarbera's duty to act in the interest of the participants of the Funds. His responsibilities included assessing recommendations from consultants regarding investments, approving lawsuits against employers, and ensuring that employers were making appropriate contributions to the respective Trust Funds. LaBarbera acknowledged at his deposition that his obligation to the Trust Funds was a fiduciary obligation and that he was required to act at all times in the best interests of the participants of the Trust Funds.

LaBarbera stated that where an alter ego is brought to the attention of the Board of Trustees, the Trustees refer the matter to fund counsel, including Bruce Levine. Typically, he said, the relief sought by counsel on behalf of the Funds includes orders to compel audits, suits to

---

[12] The Building Trust Fund is an hourly assessment of Local 282 members' wages which are used for the specific purposes of maintaining the Local 282 office building. The Strike Fund is for the sole purpose of paying Local 282 members strike benefits in the event of a labor dispute.

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 30 of 51 NYSCEF: 03/05/2018

Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 29 of 50 PageID #: 1305

recover delinquencies to the funds, actions against suspected double breasted entities, and enforcement of the terms of the Declaration of Trust.

LaBarbera stated that as President of Local 282 and Trustee of the Funds, he was aware that the Trust Funds have pursued "scores and scores" of companies for double breasting. Those double breasted operations were uncovered both by payroll auditors and through information supplied by Local 282 members. LaBarbera claimed that he was not familiar with the auditing process, and did not know precisely what records the auditors are supposed to review, but believed they should look at all "pertinent books and records." He did not believe that it would be appropriate for the Trustees to deal with the auditors directly. His understanding was that appropriate procedure was for the auditors to report to fund counsel, and then for counsel to make recommendations to the Funds.

During the course of his career as a representative of Local 282, it was LaBarbera's experience that the union generally conducted its own investigations of alleged double breasted companies by speaking to members, gathering information, and turning the information over to the Trust Funds. In addition, the Business Agents would go to business locations.

LaBarbera was aware that Joseph Sullo is a principal of Brer - Four, which has a collective bargaining agreement with Local 282. He did not know if Joseph Sullo's brother, Louis, also is a principal of Brer - Four. LaBarbera did not recall ever being in a social setting with Joseph Sullo. However, he did recall that sometime prior to 2000, he attended a dinner with Dennis Gartland Sr., Joseph Sullo, and Anthony Sullo at the Venere Restaurant in Hicksville, Long Island. He said that the dinner was arranged by Dennis Gartland Sr., because Joseph Sullo wanted to meet to discuss some "union issues." LaBarbera denied any recollection of what was

-29-

discussed at the dinner, and whether anyone else was present. LaBarbera denied knowledge that anyone at the dinner discussed the fact Joseph Sullo was operating a double breasted company.

LaBarbera stated that the first time he heard of C & H was when the Investigations Officer informed him in May 2002 that employees of Brer - Four were also working for C & H. He claimed that the Investigations Officer informed him that the Investigations Officer was in possession of pay stubs and a letter supporting the allegations. LaBarbera said that the Investigations Officer showed him the letter, which he read. The letter, he said, alleged that Local 282 members were being paid by C & H, and that LaBarbera would not do anything about it because he, LaBarbera, had worked with Anthony Sullo at King Kullen.

LaBarbera claimed that after he read the letter in May 2002, the first thing he did was bring the matter to the attention of Paul Gattus, the Business Agent for Nassau County. He said that he informed Paul Gattus that a letter had come in and that he had pay stubs suggesting that C & H was a double breasted entity. LaBarbera said that he instructed Gattus to contact the Shop Steward and the employer to investigate the matter. Shortly thereafter, he was informed by Gattus that he contacted the steward and Joseph Sullo and that C & H was a landscaping supply yard.

It was LaBarbera's recollection that after being informed of the results of Gattus' findings regarding C & H, he received an unannounced visit from Joseph Sullo and Anthony Sullo at his office to discuss C & H and the union's investigation. LaBarbera stated that he had not previously communicated with either Joseph or Anthony Sullo regarding the investigation. LaBarbera said that he told the Sullos that he had received a letter claiming that Brer - Four was operating a company by the name of C & H as a double breasted operation. LaBarbera claimed

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM    INDEX NO. 151986/2018
NYSCEF DOC. NO.  Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 32 of 51SCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 31 of 50 PageID #: 1307

that he did not identify who sent the letter to the Sullos. LaBarbera said that Joseph Sullo claimed that C & H was his landscaping yard and that it did not perform covered work. During the meeting, LaBarbera told them that he was going to have an audit done, and that he was going to bring in the drivers and interview the drivers before the Executive Board. LaBarbera did not recall that Joseph and Anthony Sullo offered to make C & H's books and records available to the auditors.

LaBarbera had no recollection of participating in a telephone conversation concerning C & H and Brer - Four with Joseph Sullo on May 10, 2002. Nor did he recall having a conference call between himself, Joseph Sullo, and Bruce Levine on the speaker phone in his office. It is particularly odd that LaBarbera has no recollection of such telephone conversations, considering said conversations go to the integrity of the requirements as outlined in the Declaration of Trust.

LaBarbera did recall two conversations with Joseph Sullo and Bruce Levine several years later regarding C & H. On the first occasion, Joseph Sullo came to his office with a subpoena from the United States Attorney's Office for the Eastern District of New York requesting documents from Brer - Four and C & H. LaBarbera asked Bruce Levine to participate in the conversation because Sullo thought the Trust Funds had issued the subpoena. The second meeting with Joseph Sullo was on May 4, 2007, when Joseph Sullo appeared, again unannounced, at LaBarbera's office. Sullo told LaBarbera that he had pled guilty to double breasting and had to make restitution to the Trust Funds. Sullo handed LaBarbera checks payable to the Trust Funds for contributions owed in connection with C & H. LaBarbera once again called Bruce Levine to his office.

-31-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
NYSCEF DOC. NO.  Case 1:18-cv-02376-GHW  Document 3-3  Filed 03/16/18  Page 33 of 51 SCEF: 03/05/2018

INDEX NO. 151986/2018

Case 9:94-cv-02919-LDW  Document 511  Filed 06/15/09  Page 32 of 50 PageID #: 1308

LaBarbera claimed to have no recollection of any conversation between himself, Bruce Levine and Joseph Sullo in which Sullo told LaBarbera that he was willing to make appropriate contributions to the Trust Funds on behalf of Eugene Plastino for Plastino's work for C & H. LaBarbera did confirm that he had a conversation with Sullo either in person or over the telephone in which Sullo indicated that he wanted to "fix the problem" by "paying everyone correctly going forward." LaBarbera did not recall a telephone conversation during which Bruce Levine and Joseph Sullo discussed how many years back an audit of C & H would have to go. LaBarbera was aware that the Trust Funds normally audit six years of books and records where double breasting is suspected.

LaBarbera stated that the special audit of Brer - Four and C & H in 2002 was conducted at his direction. He said that he instructed Gattus to contact the Trust Fund Administrator to order the special audit. LaBarbera did not recall whether or not anyone informed him at the time that an audit of Brer - Four had recently been completed. LaBarbera claimed that he never had any discussion with either William Maye, the Fund Administrator, or Paul Gattus limiting the audit of Brer - Four/C & H to the period April 27, 2001 and February 28, 2002, and he did not know why the audit did not cover the prior six years.

During his deposition, LaBarbera was shown a copy of the letter dated September 3, 2002 from Abrams, Herde and Merkel, LLP forwarding the results of the Brer - Four/C & H special audit to the Trust Funds. The letter was received at the Trust Funds on September 9, 2002. LaBarbera stated that prior to 2007, he had never seen the September 3, 2002 letter or accompanying report. He said that Maye told him orally sometime during the summer of 2002 that the audit had been completed, and that there was no alter-ego or double breasting found by

-32-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 34 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 33 of 50 PageID #: 1309

the auditors. LaBarbera stated that he does not recall ever discussing the audit with either Barrie Abrams or Adam Novick.

LaBarbera did recall having a conversation with the Investigations Officer concerning the results of the Brer - Four and C & H audit, but did not recall that Bruce Levine and Paul Gattus were present during the conversation. He recalled informing the Investigations Officer that the audit was "clean" and that there was no connection between Brer - Four and C & H. It is his recollection that the conversation with the Investigations Officer took place after he spoke with Maye about the results of the audit, which would be sometime during the summer of 2002.

LaBarbera acknowledged that he chaired the meeting in July 2002 of the Local 282 Executive Board with the drivers from Brer - Four. He said that he sent a letter notifying the members to appear before the Executive Board and instructed them to bring their pay stubs. LaBarbera stated that he was "up front" with the drivers from Brer - Four and informed them that there was an allegation that C & H was a double-breasted operation. He recalls that the drivers produced some pay stubs which he believed he reviewed at the meeting. He also said that he inquired as to what type of work the members were doing for C & H. According to LaBarbera, the members stated that when work is slow they perform landscaping for C & H. For those hours worked in the landscaping yard, they were paid by C & H.

At his deposition, LaBarbera was shown photocopies of specific checks, dated between January 1998 and February 2002 drawn on the accounts of Brer - Four and C & H. After reviewing the checks from both companies, LaBarbera acknowledged that they were made payable to members of Local 282, apparently for performing the same work on different days of

-33-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM    INDEX NO. 151986/2018
NYSCEF DOC. NO.  Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 35 of 51SCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 34 of 50 PageID #: 1310

the week. LaBarbera conceded that if the checks had been brought to his attention, it would have "confirmed" in his mind that C & H could be a double breasted operation. However, he said, these records never came to his attention.

With respect to the threatening phone calls from Anthony Sullo which he described to the Investigations Officer in 2002, LaBarbera claimed in his deposition to have no recollection of them. He did not recall even speaking on the telephone with Anthony Sullo in May or June 2002. He also said that he had no recollection of Anthony Sullo threatening him with going to Washington. LaBarbera did not recall having a conversation with either Joseph Sullo or Paul Gattus concerning Louis Sullo accusing Gattus of having prior knowledge of the Sullos' double breasted operation.

## VI.   FINDINGS

It is undisputed that Joseph Sullo, a signatory to a collective bargaining agreement with Local 282 on behalf of his company, Brer - Four, utilized his non-union company, C & H, to embezzle funds due to the Local 282 Trust Funds and Local 282 Union Funds. On April 25, 2007, Joseph Sullo pleaded guilty and was sentenced to two years' probation for his conduct, and was ordered to make full restitution to the Trust Funds of $238,979.00. Gary LaBarbera, with assistance from  Paul Gattus and Bruce Levine, bears responsibility for the fact that Sullo's double breasting went undetected by the Union and the Trust Funds for years, despite strong evidence of its existence.

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 36 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 35 of 50 PageID #: 1311

A. **The Auditors Failed To Conduct Their Audit Properly**

It is apparent from this investigation that Sullo's illegal conduct went undiscovered at least in part because of the conduct of Novick and Abrams at the auditing firm of Abrams, Herde, and Merkel LLP. Novick was tasked to audit the books and records of Brer-Four and to determine whether C & H was its alter ego. The audit that he performed was inadequate and contrary to generally accepted auditing practices and the requirements of the Local 282 Declaration of Trust. Evidence collected during this investigation suggests that the auditor's ineptitude was not inadvertent and that the audit was designed to give the appearance that a complete and thorough audit was performed. Most egregiously, Novick never requested or reviewed the books and records of C & H Materials, even though he had received direction from Trust Fund employees to "look for a possible alter ego, C & H Materials." Novick violated standard procedures for obtaining the books and records needed for a proper audit to be conducted.

Novick is an experienced auditor who, by his own estimate, has conducted thousands of union payroll audits, including many "special" audits specifically requested to look for possible double breasted companies. Novick stated during his deposition that it was his practice to send the company being audited a letter requesting an appointment to audit the books and records of the signatory company. When he is requested to determine if the company is engaging in double breasting, the letter also includes a request to review the books and records of the suspected non-union company. Novick could not produce a copy of any such letter in connection with his work on the Brer - Four/C & H audit. Morever, Donnalyn Delmedico, the contact person at Kaplan Management responsible for accommodating outside auditors' requests

-35-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM    INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW    Document 3-3    Filed 03/16/18    Page 37 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW    Document 511    Filed 06/15/09    Page 36 of 50 PageID #: 1312

for documents, stated that she had no record of such a letter. Novick could offer no explanation whatsoever for this failure.

Novick did state at his deposition that he asked Kaplan Management for the books and records of both companies and that he was denied access to C & H 's records. This testimony is not credible. Donnalyn Delmedico testified that she did not recall Novick requesting C & H's books and records and stated that if he had made such a request, she would have complied with it.[13]

Moreover, if Novick had in fact requested access to C & H's books and records and it had been denied, Novick should have, by his own testimony, notified his supervisor, Ken Jones. Jones stated during his testimony that he then would have directed the auditor to follow up, and, according to both auditors, standard practice was to send an "unable letter" to the Trust Fund administrator to notify it that the records were not being provided. Both Novick and Jones also stated that it has been their experience that once an auditor is refused access to pertinent books and records, the Trust Funds automatically refer the matter to their attorneys for further action. Here, it is apparent that Novick never told Jones that he was unable to obtain the C& H records, that no "unable letter" was sent, and no referral was made to the Trust Funds' attorneys. Novick and Abrams offered no explanation for these failures. The obvious conclusion is that Novick made no genuine effort nor had any intent to audit C & H's books and records.

It is unlikely that Novick acted alone in acting as he did. The Investigations Officer does not believe that Ken Jones shares any culpability for his conduct, although Jones

---

[13] The evidence indicates that the books and records of C & H were maintained at Kaplan Management until shortly after June 17, 2002, the last date Novick visited Kaplan Management's offices.

-36-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 38 of 51 SCEF: 03/05/2018
INDEX NO. 151986/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 37 of 50 PageID #: 1313

should have recognized and corrected Novick's failure to obtain and review C & H's books and records. As for Barrie Abrams, his repeated evasive answers during his deposition raises concerns that he may have been involved in Novick's conduct.

      B.      **LaBarbera had Substantial Evidence Demonstrating the Existence of a Double Breasted Operation**

      LaBarbera failed to carry out his responsibilities with respect to C & H. LaBarbera overlooked numerous pieces of information in their possession which indicated that Joseph Sullo was engaged in double breasting.

      First, it is apparent that during a dinner meeting at Venere's Restaurant in 1999 attended by Gary LaBarbera, among others, Joseph Sullo discussed with Paul Gattus that he was operating a double breasted operation. Indeed, Sullo came away from that meeting with the impression that both Gattus and, more importantly, the union president, LaBarbera, were willing to overlook his conduct and that he could continue to successfully defraud the Trust Funds and the Union Funds.

      Second, on May 1, 2002, the Investigations Officer provided LaBarbera with specific information regarding allegations of double breasting by Sullo, and informed him that he had three W-2 forms demonstrating that a Local 282 member, whom the Investigations Officer did not identify, had performed substantial work for C & H. In one year alone, the Investigations Officer informed LaBarbera, C & H paid the member nearly sixteen thousand dollars. Curiously, that information was not passed on to the auditors or to Gattus.

      Third, Joseph Sullo has told the Investigations Officer that in a telephone call on May 10, 2002, he again acknowledged to LaBarbera and Bruce Levine that he was operating a double breasted company; he asked LaBarbera and Levine if he could resolve the "problem" by

-37-

simply paying the wages and making contributions to the Trust Funds on behalf of the one individual member about whom a complaint was made. Sullo recalled that Bruce Levine explained to him that he could not pay the benefits for only the one member, and that if there was double breasting, the Trust Funds would have to audit six years' worth of payroll records. Levine also told Sullo that the auditors would have to collect the books from both companies, which Sullo said he would make available. Both LaBarbera and Levine stated that they have no recollection of the substance of the conversation; in fact, LaBarbera stated that he does not recall having participated in the telephone call at all. However, Sullo's recollection of having a phone conversation with LaBarbera and Levine is corroborated by Cohen, Weiss and Simon's billing records for May 10, 2002, and by the Local 282 telephone message logs. Moreover, LaBarbera testified that Sullo acknowledged the "problem" and that he wanted to "fix the problem" by "paying everyone correctly going forward."

Louis Sullo provided additional support to union officials that C & H was a double breasted entity. In Louis Sullo's telephone conversation with Paul Gattus on, or about May 8, 2002, according to Joseph Sullo, Louis screamed at Gattus and was angry that the Trust Funds were going to audit Brer - Four and C & H because, as Louis said to Gattus, Gattus knew and had agreed to overlook the Sullos' double breasted operation, thereby implicitly acknowledging that C & H was a double breasted operation. Paul Gattus substantiated this information when he told the Investigations Officer that he recalled speaking with either Joseph or Louis Sullo about C & H and that "one of the Sullos" was extremely upset about the investigation of C & H. He claimed not to recall the specific contents of the conversation. However, Gattus stated "I probably went to Gary [LaBarbera]" with the fact that Sullo was upset about the investigation. Joseph Sullo stated

-38-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM    INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 40 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 39 of 50 PageID #: 1315

to the Investigations Officer that, after the conversation between Louis Sullo and Gattus, LaBarbera called Joseph Sullo to complain about Louis Sullo accusing Gattus of having prior knowledge that the Sullos were operating an alter-ego company. LaBarbera testified at his deposition that he does not recall any conversations with Paul Gattus or Joseph Sullo on this subject.

LaBarbera also received multiple telephone calls in May and June 2002 from Anthony Sullo threatening LaBarbera if the audit was not stopped, while implicitly acknowledging that C & H was a double breasted operation. For example, on Thursday, June 6, 2002, Gary LaBarbera informed the Investigations Officer that Anthony Sullo had called him and told him that his son Joseph "may have made some mistakes," but wanted to settle the issues regarding the double breasted operation. According to LaBarbera, Anthony Sullo then threatened LaBarbera, stating " I don't want to go somewhere else with this." LaBarbera took Sullo's statement as an overt threat of some nature, but he claimed not to know what Anthony Sullo was referring to.

LaBarbera also had a meeting with Anthony Sullo over the weekend of June 8 and 9, 2002, in which Anthony Sullo again threatened LaBarbera with going "where he has to go" if he does not take care of the audit and investigation of Brer - Four and C & H. During his interview, Anthony Sullo confirmed to the Investigations Officer that he made these statements to LaBarbera. He stated that he wanted to contact an F.B.I. agent he knew in Washington D. C. Joseph Sullo corroborated his father's recollection about his father's intent to "go to Washington."

Finally, in a meeting between LaBarbera, Anthony and Joseph Sullo in LaBarbera's office in May 2002, both Anthony Sullo and Joseph Sullo again implicitly

-39-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 41 of 51 NYSCEF: 03/05/2018

Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 40 of 50 PageID #: 1316

acknowledged to LaBarbera that C & H was a double breasted company and offered to make the books and records of C & H available to the auditors. LaBarbera said he had no recollection of the meeting taking place, but clearly, no one ever took the Sullos up on that offer.

**C.    LaBarbera Did Not Properly Execute His Fiduciary Duties**

The information possessed by LaBarbera was, as LaBarbera conceded at his deposition, strong indications that C & H was a double breasted operation. LaBarbera, as a Trustee of the Trust Funds failed to act on that information, in violation of his duties owed to the Trust Funds. LaBarbera and Gattus as Trustees were clearly fiduciaries to the Trust Funds. Levine appears in his role here to have functioned as a fiduciary under ERISA and failed to carry out that duty properly. The failures of these individuals, along with the otherwise inexplicable deficiency in the audit, support a conclusion that LaBarbera did not intend to pursue the Sullos for operating an illegal double breasted operation.

As noted above, LaBarbera admitted that the Investigations Officer told him on May 1, 2002 that Eugene Plastino, a Local 282 member, appeared to be performing covered work for C & H. Nonetheless, neither LaBarbera or Gattus ever brought Plastino's C & H W-2, Wage and Tax Statement forms to the auditors' attention.[14] LaBarbera also appears to have never informed the auditors that Joseph Sullo had said that he would make the books and records of both companies available to them.

---

[14] LaBarbera testified that he was informed by the Investigations Officer that Donna Plastino had written a letter complaining that Brer - Four was paying her former husband, Eugene Plastino under another company, C & H. In addition, he claims that he was given the letter along with pay stubs demonstrating those payments. Once LaBarbera reviewed the letter he said, he assigned the matter to Paul Gattus and the auditors for further investigation. The fact is that no such letter or pay stubs ever existed.

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 42 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 41 of 50 PageID #: 1317

Also of particular note are the admissions made by Joseph and Anthony Sullo

directly to LaBarbera at their meetings and in telephone conversations with LaBarbera in May and

June 2002. These admissions appear not to have been considered by anyone in assessing whether

C & H was a double breasted entity.

Further evidence of LaBarbera's apparent lack of concern over Brer-Four's double

breasting is his conduct during the meeting he had in May 2002 with Joseph and Anthony Sullo.

During that meeting, LaBarbera called William Maye, the Fund Manager, who confirmed that

Brer - Four Transportation Corp. had indeed had an audit recently completed. According to

Joseph Sullo, once Maye confirmed that a "regular" audit had recently been conducted, LaBarbera

informed the Sullos that audit would be used by Local 282 in its investigation of Brer - Four and

C & H. As Joseph Sullo has pointed out, this made little sense because the auditors in the prior

audit had not reviewed the books and records of C & H.

Similarly, in the May 10, 2002, conference call with Joseph Sullo, Levine stated

that the audit would go back six years. Despite this, however, the Trust Funds limited the audit

period to ten months from the date of the last audit, April 27, 2001 through February 28, 2002.

No one has explained this discrepancy.

The most egregious conduct supporting the Investigation Officer's conclusion that

LaBarbera intended to overlook C & H's double breasting was his overt effort to conceal the

Sullos' double breasting from the Investigations Officer by misleading him about the results of the

audit. On June 11, 2002, LaBarbera, Levine, and Gattus informed the Investigations Officer that

the auditors did not find any connection between Brer - Four and C & H Materials and that it was

a "clean" audit. This was a complete misrepresentation. Not only was C & H clearly a double

-41-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM    INDEX NO. 151986/2018
NYSCEF DOC. NO.   Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 43 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 42 of 50 PageID #: 1318

breasted operation, but the audit report dated September 3, 2002 indicates that Novick performed

document review on June 4, 10 and 17, 2002. Thus, LaBarbera could not have known the results

of the audit report when he made that statement on June 11, 2002 because the audit was still being

performed, and the auditors had not yet drawn any conclusions when LaBarbera made his

representation to the Investigations Officer.

      **D.**    **LaBarbera's, Gattus' and Levine's**
             **Explanations For Their Conduct Are Inadequate**

      1.    Gary LaBarbera

      LaBarbera claimed at his deposition that as President of Local 282, he was busy

with "a myriad of issues," and that he had no direct control over the C & H investigation. He

asserted that he delegated responsibility over the investigation to Paul Gattus, thereby fulfilling

his duty as a fiduciary of the Trust and Union Funds. However, the evidence and testimony

collected by the Investigations Officer indicates that LaBarbera did not wash his hands of the C &

H investigation at all.

      LaBarbera was an active participant in the investigation of C & H. The evidence

indicates that LaBarbera met with Joseph and Anthony Sullo in May and June 2002 regarding the

C & H investigation, and had several telephone conversations with them during this time. Gattus

testified that on at least one occasion, he recalls seeing Anthony and Joseph Sullo coming out of a

closed door meeting with Gary LaBarbera. Gattus said that he was not informed of what

transpired during the meeting at which LaBarbera was the only union representative at the

meeting.

      Furthermore, it was LaBarbera who had telephone conversations with Joseph

Sullo, including the May 10, 2002 call, in which Joseph Sullo implicitly acknowledged that C &

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 44 of 51 SCEF: 03/05/2018

INDEX NO. 151986/2018

Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 43 of 50 PageID #: 1319

H was a double breasted operation. Gattus testified that "I probably went to Gary with it," meaning he informed LaBarbera that Louis Sullo was upset about the investigation, and it was LaBarbera who called Joseph Sullo to complain about Louis' conduct. LaBarbera stated that he has no recollection of the conversation, or the incident. Further, it was LaBarbera whom Anthony Sullo threatened to "go to Washington" if the C & H investigation continued.

It was also LaBarbera who controlled the meeting of the Executive Board on July 18, 2002 attended by the Local 282 members employed by Brer - Four. It was LaBarbera who directed that the Local 282 members working for Brer - Four appear before the board and bring their pay stubs from both Brer - Four and C & H.

The Investigations Officer attended that Executive Board meeting. LaBarbera told the members that "I understand from Joe Sullo that you do not do bargaining unit work, worked around the yard and on the trucks."[15] However, while some Brer - Four members did produce weekly pay stubs from Brer - Four, no one produced pay stubs from C & H even though it was clear that they did perform work for C & H. LaBarbera did not make any effort to obtain independent statements from the members or their C & H pay stubs.

LaBarbera also took responsibility for communicating with the Investigations Officer regarding the audit and its conclusions. On June 6, 2002, it was LaBarbera who informed the Investigations Officer that an audit of Brer - Four was being conducted. On Tuesday, June 11,

---

[15] It should be noted that among employers in the construction industry, and in particular, Local 282 employers, it is a common practice to claim that employees are not working in "covered employment." The Board of Trustees usually takes the position that "once a Teamster, always a Teamster," i.e., that where a Local 282 member is being paid by an signatory employer or the signatory employer's alter ego company, the Trustees expect contributions to be made on behalf of those members according to the Declaration of Trust. For reasons that are unclear, that philosophy was not applied here.

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM       INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 45 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 44 of 50 PageID #: 1320

2002, just five days later, it was again LaBarbera who claimed to the Investigations Officer that the auditors did not find any connection between Brer - Four, and C & H.  Gattus and Levine were present at that meeting, but it was primarily LaBarbera who spoke.

LaBarbera also tried during his deposition to explain the misrepresentations he made in that June 11, 2002 meeting.  When confronted at his deposition with evidence that he could not possibly have known on June 11, 2002 what the auditors' findings were because the audit was not yet completed, LaBarbera tried to explain that he must have relied upon information provided by the fund manager, William Maye regarding the results of the audit. However, even if the audit had been completed as of that date, Adam Novick, Ken Jones, Barrie Abrams, and William Maye all testified that they did not inform anyone at Local 282 about the results of the audit in June, 2002.  In fact, the audit results were not transmitted to the Trust Funds until September 3, 2002.  Furthermore, William Maye testified that he was not made aware of the results of the Brer - Four audit until 2007, and his testimony was substantiated by Teresa Cody, the fund employee responsible for communicating with the auditors.  Cody testified that she did not communicate the results of the audit to Mr. Maye at any time in 2002.

2.    Paul Gattus

Although Gattus may argue that he was simply "out of the loop" with respect to the investigation of C & H, this defense is inadequate. First, Gattus was the business agent for Nassau County and was responsible for knowing what was the status of trucking companies on Long Island. Second, he expressly told the Sullos in or about 1999 how to operate a double breasted entity and that he knew that the Sullos were double breasting. Third, the Sullos acknowledged to Gattus in 2002 in various telephone conversations described above that they

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM    INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 46 of 51SCEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 45 of 50 PageID #: 1321

were operating C & H as a double breasted entity. Gattus also participated in the meeting with the Investigations Officer on June 11, 2002 during which it was misrepresented that the C & H audit was complete and "clean". Gattus took no action to correct this misrepresentation.

     3.     Bruce Levine

Bruce Levine may assert that he was simply acting as counsel to the union. Although, because of attorney client privilege, the full nature of Bruce Levine's participation in the investigation of C & H is not completely clear, he appears to have acted as a functional fiduciary of the Trust Funds, and in that capacity, failed to carry out his duty. Levine participated in the May 10, 2002 telephone call with Joseph Sullo in which Sullo implicitly acknowledged that C & H was a double breasted operation. He also knew that the audit should have gone back six years, yet appears to have done nothing to ensure that occurred. Levine also participated in the meeting with the Investigations Officer on June 11, 2002 during which it was misrepresented that the C & H audit was complete and "clean". Levine took no action to correct this misrepresentation.

It is not clear what the motivation was for the conduct of Gary LaBarbera. However, it is clear that proper procedures were not followed and material misrepresentations were made which permitted Sullo to continue defrauding the Trust Funds and Union Funds. Although the Investigations Officer does not know the specifics of Anthony Sullo's repeated threats to LaBarbera were, other than to "go to Washington," apparently the F.B.I., it is possible that these threats were significant enough to motivate LaBarbera, in particular, at first to overlook, and later, to take steps to prevent the disclosure of, C & H as a double breasted operation.

-45-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 47 of 51 SCEF: 03/05/2018

Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 46 of 50 PageID #: 1322

## VII.   CONCLUSIONS

From the conduct detailed in this report, the Investigations Officer has concluded

the following:

1. From 1998 until approximately 2002, Joseph Sullo employed Local 282 members

   through his alter ego company, C & H Materials, Inc., to perform work covered by

   the collective bargaining agreement he signed on behalf of Brer - Four

   Transportation, Inc., without making appropriate contributions to the Trust Funds

   or the Union funds on behalf of those members.  Throughout that time, no member

   of Local 282, including the Local 282 Shop Steward employed by Brer - Four and

   C & H, reported the double breasting, took any action to stop it from occurring, or

   caused the Trust Funds to pursue the company for unpaid contributions.

   Accordingly, these members can be said to have participated in the scheme to

   defraud the Trust Funds and Union Funds

2. It is likely that Paul Gattus and Gary LaBarbera knew as early as 1999 at the dinner

   at Venere's Restaurant that the Sullos were operating a double breasted entity,

   expressly agreed to overlook the illegal conduct and agreed not to initiate efforts to

   collect monies owed to the Trust Funds.

3. In 2002, after the Investigations Officer told LaBarbera that C & H might be

   operating as a double breasted entity, no genuine effort was made by the union or

   the Trust Funds to uncover C & H as a double breasted operation.  Rather, the

   audit and investigation conducted by the Union and the Trust Funds was

   perfunctory and largely designed to make it appear that a proper review was being

-46-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW Document 3-3 Filed 03/16/18 Page 48 of 51 SCEF: 03/05/2018
Case 9:94-cv-02919-LDW Document 511 Filed 06/15/09 Page 47 of 50 PageID #: 1323

conducted.

4.    Consistent with this purpose, the auditors completely failed to conduct their audit properly. Their failure was so blatant that it appears to be intentional. Although no evidence has been uncovered to date that anyone specifically directed them to conduct the audit in an improper fashion, there seems to be no other plausible explanation for their conduct. As a result of the disclosures uncovered during this investigation, the payroll auditing services of Abrams, Herde and Merkel LLP have been terminated by the Trust Funds, a decision by the Board of Trustees of the Trust Funds that the Investigations Officer supports.

5.    The conduct of Bruce Levine in this matter is also troubling. Levine participated in the May 10, 2002 telephone conversation with Joseph Sullo in which Joseph Sullo implicitly acknowledged that he was conducting a double breasted operation. Levine's responses in that conversation that Joseph Sullo described and which Levine could not recall nor therefore deny, were that the Trust Funds would have to recoup payments on behalf of all the Local 282 members who performed covered work for C & H, not just for the one member whose ex-wife had complained, and that it would be necessary to audit the books and records of C & H for six years. Yet Levine appears to have taken no steps to ensure that such an audit was conducted. Thus, the evidence strongly suggest that Bruce Levine as co-counsel to the Trust Funds was in possession of evidence that C & H was a double breasted operation and, along with LaBarbera and Gattus, overlooked that evidence. Further, Levine appeared to act as a functional fiduciary to the Trust

-47-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM    INDEX NO. 151986/2018
NYSCEF DOC. NO.  Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 49 of 51CEF: 03/05/2018
Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 48 of 50 PageID #: 1324

Funds. He appears to have violated that fiduciary duty by failing to ensure that the evidence of C & H's double breasting was properly brought to the attention of both the auditors and board of trustees.

6.    Paul Gattus' conduct in this matter is also problematic. He appears to have had knowledge of the double breasting perhaps as early as 1999, and according to Joseph Sullo, approved, or at least overlooked, Sullo's conduct. As a fiduciary of the Trust Funds and the Business Agent assigned to Nassau County, he had responsibility to ensure that the double breasting did not continue after he learned of it. He also had responsibility for ensuring that the investigation of C & H in 2002 was thorough and appropriate, which it was not. He failed to carry out his fiduciary duties.

7.    The Investigations Officer concludes that responsibility for the Trust Funds' failure to uncover C & H's double breasted operation lies primarily with Gary LaBarbera. While his motivation remains unclear, LaBarbera clearly took measures which prevented the discovery that C & H was a double breasted entity, thereby causing a substantial loss to the Trust Funds. His most notable action, as described above, is the misrepresentation he made to the Investigations Officer on June 11, 2002, that an audit was completed and revealed no double breasted operation. Moreover, given the information that was in his possession which substantiated that C & H was being operated as a double breasted operation, his failure to act appropriately is mystifying. Further, while the Investigations Officer was unable to elicit any evidence that LaBarbera directed the auditors how to conduct their audit, or

-48-

FILED: NEW YORK COUNTY CLERK 03/05/2018 05:57 PM    INDEX NO. 151986/2018
NYSCEF DOC. NO. Case 1:18-cv-02376-GHW   Document 3-3   Filed 03/16/18   Page 50 of 51 SCEF: 03/05/2018

Case 9:94-cv-02919-LDW   Document 511   Filed 06/15/09   Page 49 of 50 PageID #: 1325

communicated with them in any way about the audit, their blatant failure appears
consistent with the overall approach to the allegations of double breasting by
Joseph Sullo.

Based upon his conduct in this matter, it is the opinion of the Investigations Officer
that Gary LaBarbera failed to fulfill his fiduciary responsibility to the Trust Funds and Union
Funds. Furthermore, his misrepresentations to the Investigations Officer on June 11, 2002
constituted an act of corruption in violation of the Consent Judgment. It therefore is the
conclusion of the undersigned Investigations Officer that Gary LaBarbera violated his oath of
office as President of Local 282, International Brotherhood of Teamsters, and failed to fulfill his
fiduciary duties as a Trustee to the Local 282 Welfare, Pension, Annuity, Job Training, and
Vacation and Sick Leave Trust Funds. In addition, Gary LaBarbera failed to fulfill his fiduciary
duties as a Trustee of the Union Funds. In view of the aforementioned and pursuant to the Third
Amended Consent Judgment, Section III - Paragraph H.1 the Investigations Officer Is referring
the matter and proposed charges to the Local 282 President. It is the recommendation of the
undersigned that Gary LaBarbera be removed as a member of the International Brotherhood of
Teamsters because he has brought reproach upon the International Brotherhood of Teamsters by
failing to fulfill his fiduciary responsibilities. In addition, it is recommended that Gary LaBarbera
be charged with violating the Consent Judgment, in that he knowingly and willfully violated the
Consent Judgment, Section I, paragraph C, by knowingly obstructing the work of the
Investigations Officer by, among other things, his June 11, 2002 statements to the Investigations
Officer. Pursuant to the Consent Judgment, Section III, paragraph J, this matter is being referred
to the United States Attorney for the Eastern District of New York for his review and

determination.

Dated: June 12, 2009

Respectfully submitted:


Robert A. Machado
Investigations Officer